[Decided August 9, 1897.]

## SHATTUCK *v.* KINCAID.

(49 Pac. 758.)

31   379
31   446
31   479
—————
31   379
44   383
31   379
46   581

APPROPRIATION DEFINED.— An "appropriation" is a setting aside or designation of particular funds for the discharge of certain definite and specified obligations, and may relate to a fixed amount of liability or to one that is continuing.

APPROPRIATION FOR PAYMENT OF STATE OFFICERS.— A statute fixing the amount of the salary of a public official and prescribing the time and manner of payment does not constitute a continuing appropriation for the discharge of such obligation, under a constitutional provision that "no money shall be drawn from the treasury but in pursuance of appropriations made by law," in view of contemporaneous legislative construction of the statute to that effect.

LEGISLATIVE CONSTRUCTION.— Where a statute has for many years and from almost the date of its enactment, been construed by successive legislatures in a particular manner not inconsistent with the language used, the courts will hesitate to adopt a different construction.

DUTY OF SECRETARY OF STATE TO AUDIT CLAIMS.— When a claim against the state is presented to the secretary he must pass upon it by either rejection or approval without regard to whether the legislature has or has not appropriated money to meet it, and, if he allow the claim, he must indorse upon it the amount so allowed, and the name of the particular original fund from which it is to be paid, and draw his warrant on the state treasury therefor: *Brown* v. *Fleischner*, 4 Or. 132, overruled.

MEANING OF WORD "FUND" IN SECTION 2208, HILL'S ANN. LAWS.— The word "fund" as used in section 2208 of Hill's Ann. Laws means one of the original funds subsisting by law.

EFFECT OF DRAWING WARRANTS— AUDITING CLAIMS.— The drawing of a warrant on the state treasury is, under the present statutes, a part of the act of auditing, and is not a drawing of money from such treasury.

WARRANT AS EVIDENCE OF CLAIM.— A warrant is only *prima facie* evidence of the validity of a claim against a municipality or commonwealth: *Goldsmith* v. *Baker City*, 31 Or. 249, and *Frankl* v. *Bailey*, 31 Or. 288, approved.

REFUSAL OF TREASURER TO PAY WARRANT.— Since a warrant is not conclusive evidence of an indebtedness it is the duty of the state treasurer to refuse payment unless it represents a claim authorized by law: *School District* v. *Lambert*, 28 Or. at page 224, and *Goldsmith* v· *Baker City*, 31 Or. at page 252, approved.

SPECIAL APPROPRIATION.—The expression "where provisions for the payment thereof shall have been made by law," used in section 2230, Hill's Ann. Laws, refers to only those obligations incurred by the state under some previous authority, and does not include special appropriations made for particular purposes by acts which within themselves authorize the incurring of the expense.

MANDAMUS.—Mandamus will lie to compel the performance of the duty of auditing a claim for services to the state, where, as in the case of salaries of public officers, the nature and amount of the services rendered are definitely fixed and ascertained, and the compensation therefor is regulated by law, since in such case the duty is merely ministerial.

From Marion: HENRY H. HEWITT, Judge.

E. D. Shattuck instituted a mandamus proceeding against Harrison R. Kincaid, as Secretary of State of Oregon, to compel him to audit a claim against the state and to issue a warrant upon the state treasurer for the amount he allowed thereon. The claim was for that portion of his salary as judge of the circuit court for the fourth judicial district of said state due for the quarter ending March 31, 1897, amounting to $750.00. The claim was properly stated, certified, and verified, as by law required, and presented to the secretary with a demand that he pass upon it and draw a warrant on the state treasurer therefor, but he refused entirely to consider the claim for the reason that the legislature failed to organize in 1897, and, therefore, no appropriations were made, contending that the authority to audit accounts is dependent upon an appropriation having previously been made by the legislature for their payment. A demurrer to the alternative writ was sustained, and judgment entered for the defendant, whereupon plaintiff appealed.

REVERSED.

For appellant there was a brief and an oral argument by *Mr. Ralph E. Moody*.

For respondent there was a brief and an oral argument by *Messrs. N. B. Knight* and *A. C. Woodcock*, to this effect:

The secretary of state is, by virtue of his office, auditor of public accounts: Const., Or., art. VI, sec. 2.

It is the duty of the legislature to provide for raising revenue sufficient to defray the expenses of the state for each fiscal year: Const., Or., art. IV, sec. 2.

No money can be drawn from the treasury except in pursuance of appropriations made by law: .Const., Or., art. IV, sec. 4.

The secretary of state has no authority to audit any claim and draw any warrant upon the state treasurer for the same in the absence of an appropriation made by the legislature for its payment: Hill's Ann. Laws, § 2208, subd. 7; Const., Or., art. IV, sec. 4; *Brown* v. *Fleischner*, 4 Or. 132; *Reesdale* v. *Walker*, 52 U. S. (11 How.), 271; *Moses* v. *Jumel*, 31 La. Ann. 142; *Stratton* v. *Green*, 45 Cal. 149; *State* v. *Kinney*, 9 Mont. 389.

In the payment of claims the law makes no distinction whether the amount is fixed by law or not: Const., Or., art. IX, sec. 7; *Myers* v. *English*, 9 Cal. 341; *State* v. *Leidtke*, 9 Neb. 468; *Ristine* v. *State*, 20 Ind. 338.

The secretary of state is the financial agent of the state, and the limitations upon the authority of the state treasurer under the constitution and laws apply also to the secretary in his management of the fiscal concerns of the state: Const., Or., art. VI, sec. 2; Hill's Ann. Laws, § 2208; *State* v. *Walliets*, 12 Neb. 409.

The warrant of the secretary is merely an order upon the treasurer for the present payment of a certain claim out of a particular fund in the treasury previously set apart and appropriated for that purpose: Hill's Ann. Laws, § 2208, subds. 7, 8; *State* v. *Lindsley*, 27 Pac. 1019.

Opinion by MR. JUSTICE WOLVERTON.

This is a proceeding by mandamus to require the secretary of state to audit a claim, and draw his warrant for the salary of a circuit judge for the quarter ending March 31, 1897. The secretary resists the proceeding upon the ground that, the legislature having failed to make appropriations for the current expenses of the state, he is without authority either to audit or draw his warrant for such claim. The case comes here upon demurrer to the alternative writ, which was sustained by the lower court.

By section 2297, Hill's Ann. Laws, it is provided that "each of the judges of the circuit courts in this state (shall) receive an annual salary of three thousand dollars, payable quarterly, and no other allowance for their services, either directly or indirectly," and by section 2230 that "the salaries of the governor, secretary of state, and other officers of the state, shall be paid quarterly, out of the treasury of this state, upon the warrant of the secretary of state, commencing from and after they enter upon the duties of their respective offices." These sections clearly establish the plaintiff's right to the quarter's salary claimed, and upon this point there is no contention.

Article IX, section 4 of the state constitution provides that "no money shall be drawn from the treasury but in pursuance of appropriations made by law," and article VI, section 2, constitutes the secretary of state the auditor of public accounts.

Section 2230, of our statutes, was section 4 of an act approved June 2, 1859, and by the same act it was provided, among other things, as follows:—

"Sec. 11. The secretary of state shall superintend the fiscal concerns of the state, and manage the same in the manner prescribed by law; "to keep fair, clear, distinct and separate accounts of all the funds and revenues of the state, and also of all expenditures, disbursements and investments thereof, showing the particulars of every expenditure, disbursement and investment. * * * To examine and determine the claims of all persons against the state in cases where provisions for the payment thereof shall have been made by law, and to indorse upon the same the amount due and allowed thereon, and from what fund the same is to be paid, and draw a warrant on the treasury for the same; and he shall report to the legislature at the commencement of each regular session a complete list of all accounts so audited, together with a general statement of the fiscal concerns of the state; provided, that no account shall be so audited, except the same be duly verified by the oath, affidavit or affirmation of the claimant or his agent, and all accounts shall be kept on file in his office; "to enter in a book to be kept for that purpose, an abstract of all warrants drawn on the treasury, showing the date, number, name of the claimant,

the amount claimed, the amount allowed thereon, and from which fund to be paid. * * *

Sec. 12. Whenever any account shall be presented to the secretary of state for settlement, he may require the person presenting the same, or any other person or persons, to be sworn before him touching such account, and when so sworn, to answer orally or in writing as to any facts relating to the justness of the account. If any person interested shall be dissatisfied with the decision of the secretary on any claim, account, or credit, it shall be the duty of the secretary, at the request of such person, to refer the same, with his reasons for his decision, to the legislative assembly, and all persons having claims against this state shall exhibit the same with the evidence in support thereof to the secretary to be audited, settled, and allowed within two years, and not afterward. And in all suits brought in behalf of the state, no debt or claim shall be allowed against the state as a set-off but such as have been exhibited to the secretary, and by him allowed or disallowed, except only in cases where it shall be proved to the satisfaction of the court that the defendant at the time of trial is in possession of vouchers which he could not produce to the secretary, on account of absence from the state, sickness or unavoidable accident."

Other sections of the same act provide that "the state treasurer shall keep his office at the seat of government, shall receive and have charge of all moneys paid into the state treasury, and shall pay out the same as directed by law."

"It shall be the duty of the treasurer: * * *

Second—To pay on demand out of the state treasury all sums authorized by law to be so paid, if there are appropriate funds in the treasury to pay the same, and when any such sum is required to be paid out of a particular fund it shall be paid out of such fund only; and he shall pay no fund out of the treasury except in pursuance of law authorizing the payment thereof; but when any claim or account is authorized by law to be paid out of a general or contingent appropriation, the same shall be paid by the treasurer upon the warrant of the secretary of state.  Third—To pay all warrants on the treasurer in the order in which they are presented, out of the appropriate fund; if there are no such funds in the treasury, then he shall indorse on such warrants 'Not paid for want of funds,' together with the date, and all warrants so indorsed shall draw legal interest from and after such indorsement."

There is some confusion in numbering the sections of the original act, but the sections referred to are designated in Hill's Ann. Laws as sections 2208, 2209, 2217 and 2219.

The plaintiff contends, *first*, that the law fixing the amount of his salary, and providing for the manner of its payment, constitutes an appropriation of funds out of the treasury with which to meet the installments as they become due; and, *second*, that the secretary is required to audit his claim therefor, and draw a warrant for the amount found due, even though it be determined that there has been no appropriation made to meet it.  The principle involved in the declaration of the fundamental law that "no money shall be drawn

from the treasury but in pursuance of appropriations made by law," had its origin with the British parliament. It had, prior to the time of Charles II, occasionally and at long intervals exercised the right of appropriating supplies to particular purposes as the needs of the government demanded, but during the reign of that monarch it employed the authority generally, although perhaps not in every instance. It was not, however, until after the revolution of 1688 that the right and authority became firmly established. The principle, as then and since understood, is "that supplies granted by parliament are only to be expended for particular objects specified by itself": Taswell—Langmead, English Constitutional History, 620, 621. The abuse which the establishment of the principle was designed to correct was the exercise of official discretion in paying out and disbursing the public funds, and its purpose was to endow the legislative body with the sole authority, and impose upon it the specific duty, of deciding how and when such funds shall be applied to the discharge of the expenses, debts, or other engagements or liabilities of the government; and such is the limitation imposed by our present constitutional provision: *Ristine* v. *State,* 20 Ind. 328; *State* v. *Burdick* (Wyo.), 33 Pac. 125; 2 Opinions of Attorneys-General, United States, 670. An " appropriation, as applicable to the general fund in the treasury, may, perhaps, be defined to be," says PERKINS, J., in *Ristine* v. *State,* 20 Ind. 328, "an authority from the legislature, given at the proper time, and in legal form, to the proper officers, to apply sums of money out of that which may be in the treasury in

a given year, to specified objects or demands against the state." Webster defines "appropriation" as "the act of setting apart or assigning to a particular use or person in exclusion of all others; application to a special use or purpose, as of  *  *  * money to carry out some public object." No particular expression or set form of words is requisite or necessary to the accomplishment of the purpose, and the appropriation may be prospective as well as in præsenti; that is "it may be made in one year of the revenues to accrue in another or future years, the law being so framed as to address itself to such future revenues": *Humbert* v. *Dunn*, 84 Cal. 57 (24 Pac. 111); *Proll* v. *Dunn*, 80 Cal. 220 (22 Pac. 143). And in every instance it becomes a question of legislative intent to be gathered under the settled rules of interpretation from the language employed, the context, the necessity for the enactment, and purpose to be accomplished, considered in the light of contemporaneous circumstances. FIELD, J., in *McCauley* v. *Brooks*, 16 Cal. 28, says: "To an appropriation, within the meaning of the constitution, nothing more is requisite than a designation of the amount, and the fund out of which it shall be paid. It is not essential to its validity that funds to meet the same should be at the time in the treasury." It is maintained by some authorities that constitutional provisions fixing the salaries of state officers proprio vigore make an appropriation out of the treasury for the payment of the same as they become due, and this upon the ground that such salaries have become fixed and unchangeable by any power vested in the legislature, and that to withhold the funds neces-

sary to their payment would be subversive of the will
of the people as expressed by the oiganic law.   It is
said, arguendo, that if the legislature is without power
to reduce the salaries of such officers, it cannot be
affirmed that it may take away the whole by withhold-
ing the funds requisite to their payment.   In support
of this view *Thomas* v. *Owens*, 4 Md. 189, decided in
1853, is perhaps the leading case.   It has been fol-
lowed in *State* v. *Hickman*, 9 Mont. 370 (23 Pac. 740),
and *State* v. *Weston*, 4 Neb. 216, and criticised in *Myers*
v. *English*, 9 Cal. 341.   The Nebraska case, however,
presents a dissimilar feature, in that the constitution
provides that "the authorities shall draw warrants on
the state quarterly" for the salaries fixed thereby,
"which shall be paid out of any funds not otherwise
appropriated."   Other cases apply the principle to
legislation under constitutions which provide that
salaries of state officers shall neither be increased nor
diminished during the terms for which they shall
have been appointed or elected.   It is maintained by
these that the law fixing such salaries becomes im-
mutable in so far as it may affect incumbents, and
that the legislature is powerless to cut off by indirec-
tion that which it could not do by direct enactment,
and hence that a statute merely fixing the amount to
be received and the times of payment is, in effect, an
appropriation of funds which become applicable to
the discharge of their stated compensation as it be-
comes due.   And we may say the very decided tend-
ency of recent adjudications is in support of this ad-
vancement upon the doctrine: *State* v. *Burdick* (Wyo.),
33 Pac. 125; *People* v. *Goodykoontz*, 22 Colo. 507 (45

Pac. 414). As directly opposed to this view see *Myers* v. *English*, 9 Cal. 341. Yet other authorities mantain that the result of such legislation is to effectuate an appropriation, regardless of the fundamental law limiting the power of the legislature to change the amount of official salaries to times other than during incumbency, and that no annual or special appropriation is otherwise necessary to authorize the disbursement of public funds by the officers in charge in payment of such demands as they arise. See *Reynolds* v. *Taylor*, 43 Ala. 420, and *Carr* v. *State*, 127 Ind. 204 (22 Am. St. Rep. 624, 11 L. R. A. 370, 26 N. E. 778). It is difficult to understand, however, upon what principle an enactment of the nature indicated can have the effect claimed for it. The plain letter of the statute falls very far short of an express direction to that end, and the apparent object to be attained is fully accomplished when the salary and times of its payment are definitely fixed. No other or further intendment is predicated of statutes of like nature where individuals only are concerned, and a different rule ought not to prevail because the state is concerned. But we believe the weight of authority is opposed to this latter advance upon the doctrine, and that the better rule requires something more by which to indicate a legislative interidment to effectuate an appropriation.

In *Nichols* v. *Comptroller*, 4 Stew. & P. 154, the case upon which *Reynolds* v. *Taylor*, 43 Ala. 420, seems to have been based, it was determined that an act fixing a salary "payable quarter-yearly out of any money in the treasury not otherwise appropriated" made an appropriation for the purpose of meet-

ing the quarterly payments. In *Humbert* v. *Dunn*, 84 Cal. 57 (24 Pac. 111), the act under consideration provided that "each member [of a commission] shall receive a salary of $2,400 payable monthly, * * * to be paid out of any money in the treasury not otherwise appropriated," and it was held that this operated as an appropriation. The statutory provisions, as indicated by these cases, are similar to the Nebraska constitutional provision above referred to. And in *Cutting* v. *Taylor*, 3 S. Dak. 11 (15 L. R. A. 691, 51 N. W. 949), which comes nearer the case at bar, the language employed was: "The auditor * * * shall issue and deliver to the claimant in each city, town, etc., his warrant upon the territorial treasurer for an amount equal to 2 per cent. of the premiums received upon the policies issued upon any property in any such city, town, etc., and such warrant shall be paid by the territorial treasurer upon presentation thereof." See, also, *State* v. *Kenney*, 10 Mont. 485 (25 Pac. 1022). From statutes of the nature indicated by these authorities the inference is natural and legitimate that it was the legislative intent not only that the amount and times of payment of the salaries should be rendered definite and certain, but that, when falling due, funds in the treasury applicable to their payment should be at all times in readiness for their prompt discharge, and hence the appropriation as a necessary result to meet the purposes of the legislation. It is one thing to fix the amount and times of payment of an officer's salary, and quite another to provide funds, and make them available at specified times, so that the state will not at any time default in its payments,

and it does not occur to us that a fixed salary with stated times for the payment of proportional installments thereof can, with any greater propriety, carry with it an appropriation of funds with which to meet the payments than where the state has become otherwise obligated under authority of law, and no appropriation has been made anticipating payment. Whatever may be the correct rule where the salary is fixed by the constitution, or where it is by that instrument rendered unchangeable during incumbency, followed by legislation simply fixing the amount and times of payment thereof, it is quite certain that, if regard be paid to the known and well-settled rules of statutory construction, the legislature has not, by the enactment of such a statute, without else, manifested an intention of setting aside funds in the treasury for its payment. Something more is needed, some setting aside of a particular fund, or designation of a fund, out of which it shall be paid, or direction to the officer in charge requiring him to make payment at particular times, or that it be paid out of the treasury. And this gets us back to the original proposition that an appropriation is the setting aside or designation by express direction or by implication of particular funds for the discharge of definite and specified obligations or liabilities, which, however, may be in contemplation, such as will arise in the future, and the appropriation may be continuing in its nature, but the legislative intent to have funds always ready and applicable to their prompt discharge at stated times works out the appropriation, and nothing short of it can have such an effect. Under the legislative direc-

tion that the salaries of all state officers "shall be paid quarterly out of the treasury of this state, upon the warrant of the secretary of state, commencing from and after they enter upon the duties of their respective offices," and under the authorities which seem pertinent to the inquiry, we would be inclined to hold that a continuing appropriation had been thus effectuated for the payment of such salaries quarterly were it not for a legislative construction of the act nearly contemporaneous with its enactment. There is some reason for believing that public funds were disbursed under this law without further direction before the meeting of the succeeding or first regular session of the state legislature which convened September 10, 1860, but at such session a general appropriation bill was passed setting aside funds for the payment of such salaries, specifying with much particularity the incumbent by his official title, and the amount for each. And every succeeding regular biennial legislative assembly since then, save in 1868 and 1897, has, in its general appropriation bills, made like specific appropriations for these salaries. So that the act of 1859 has received what may be termed a contemporaneous legislative construction, which has been acquiesced in and acted upon by that body for more than a third of a century, and we feel bound by the construction thus given the act, and therefore hold that it did not effectuate a continuous appropriation for the payment of the salaries of state officers: *Prime* v. *McCarthy,* 92 Iowa, 569 (61 N. W. 220).

This brings us to the second contention, touching the authority of the secretary of state to audit and

draw his warrants for the claim, and the solution of
this question depends entirely upon the construction
of the statute which prescribes his duties.   Under the
constitution he is made the auditor of public accounts,
and under the law he is charged with superintending
the fiscal concerns of the state, and it is with reference
to the functions of his office thus designated that we
must consider the enactment.   He is required "to ex-
amine and determine the claims of all persons against
the state in cases where provisions for the payment
thereof shall have been made by law," and we are led
to inquire, *first*, what claims are meant?   The answer
is, such as the law has made provisions for their pay-
ment, and by this is meant such obligations and lia-
bilities as the state may have incurred under warrant
of law previously enacted.   No person can acquire a
valid claim against the state except in such cases as
the fundamental law has prescribed or the legislature
has through its enactments permitted, and directed,
either expressly or impliedly, that payment shall be
made for that which constitutes the consideration for
the claim.   Acting in his capacity as auditor, the sec-
retary is required, when a claim is presented, to look
to the law, and determine whether the claimant has
brought himself within any of its provisions allowing
him compensation.   In other words, before allowing
the claim he must be able to put his finger upon some
law which gives the claimant a standing in his tri-
bunal upon which he can demand payment by the
state.   For instance, the law has made provisions for
the payment to plaintiff of a stated salary for his ser-
vices, and this constitutes such a claim as is contem-

plated by the statute. Further, he is directed to indorse upon the claim, if allowed, "from what fund the same is to be paid," and it is suggested that the fund here meant is one specially appropriated and set aside by the legislature for the payment of the designated claim, or of a designated class of which it constitutes one. But it is not probable that a fund thus constituted was the one intended for designation by the indorsement. With much greater reason we may infer that it had reference to some one of the few funds that are provided for under general laws in pursuance of fundamental enactments. The constitution directs that "the legislative assembly shall provide for raising revenue sufficient to defray the expenses of the state for each fiscal year," and that "every law imposing a tax shall state distinctly the object of the same to which only it shall be applied": Const., art. 9, §§ 2, 3. And it has been the usage of the legislature, by virtue of these provisions, to direct the levying of taxes for specified purposes, such as for current expenses, for common school, and for university purposes, and the like; thus creating separate and distinct funds into which the revenues flow from the tax collector or other sources of income, and out of which all the expenses of the state government must be met. Taxes levied for current expenses go into the general fund; those for common school purposes, together with interest derived from investments, into the common school fund, and the same with the university and other funds. And if a tax is directed to be levied for a special purpose it goes into the special fund thus provided for, and these are the funds of which the

secretary shall take account in making his indorse-
ments and drawing his warrants upon the treasury.
All the earlier appropriations proceeded upon this
idea, and the later ones are not in conflict with it.
The first general appropriation act adopted in 1860
employed the following language, viz.: "That the fol-
lowing sums be and the same are hereby specifically
appropriated to the several objects hereinafter men-
tioned for two years,   *   *   *   to be paid out of any
money in the treasury not otherwise appropriated."
Then follows an itemized statement of the various sal-
aries and expenses for which it shall be disbursed,
without naming or designating any separate fund,
thus leaving but a single fund for the secretary to take
into account in the indorsement of claims and in draw-
ing his warrants.   This practice was continued until
1872, when for the first time the legislature adopted
the plan of naming separate funds in the appropria-
tion bills, but subsequent acts have not been uniform
in this respect.   The language in all to effectuate the
appropriation is in purport the same, "to be paid out
of any money in the treasury not otherwise appropri-
ated," or from the common school fund, university
fund, or other fund, as the case may be.   Then follows
the naming of subdivided funds, as "executive fund,"
"general fund," "judicial fund," and the like.   But in
most of, if not all, these subdivided funds are con-
tained items of salaries and expenses to be paid, as in
the former acts.   The legislature could, if it saw fit,
name a fund for each separate salary or item of ex-
pense, but, howsoever the original funds may be sub-
divided by the appropriation bill, the appropriation is

exhausted as to each separate item as the money necessary to its discharge is paid out by the treasurer; that is, the appropriated funds for any one item are not applicable to the payment of any other item in the whole list, so that after all the specific items govern the disbursements, and not the subdivided funds as designated in the act. The term "fund" is not synonymous with "appropriation," and as a matter of fact there are not many separate funds in the treasury, but there may be many appropriations, and most of the latter are payable out of the same fund—the general fund: *Proll* v. *Dunn*, 80 Cal. 226 (22 Pac. 143).

This understanding of the term is in harmony with the apparent sense in which it is used in the same act in a clause for the direction and control of the state treasurer. He is required "to pay on demand out of the state treasury all sums authorized by law to be so paid, if there are appropriate funds in the treasury to pay the same, and when any such sum is required to be paid out of a particular fund, it shall be paid out of such fund only; and he shall pay no fund out of the treasury except in pursuance of law authorizing the payment." The first clause enjoins upon the treasurer the duty of paying out of the treasury all sums authorized by law to be paid; that is to say, he, like the secretary of state, in auditing must see to it that the sums disbursed are upon valid claims or demands against the state, such liabilities or obligations as the law has authorized to be incurred. All sums thus authorized by law must be paid if there are appropriate funds in the treasury; and when such sum is required to be paid out of a

particular fund, then out of such fund only. Herein there is no reference to any appropriated fund set aside in the treasury for a specific purpose. The "funds" referred to are such as may be applicable in the disbursement of sums authorized by law to be paid. And the particular fund may be one of the few provided for by law under the constitution. In the latter clause, however, we find an additional limitation upon the action of the treasurer. He shall pay no fund — that is, no one of the funds provided by law, and of course no part of any one of such funds — out of the treasury except in pursuance of law authorizing the payment thereof, or, in other words, the disbursement of the fund. This contemplates an appropriation of the fund, and an inhibition upon the treasurer to disburse it in any event unless so appropriated. The clause authorizing the treasurer to indorse upon warrants "Not paid for want of funds" must be read in connection with these clauses, and, when so interpreted, it becomes at once intelligible and plain without the changing of a syllable or a sentence; otherwise, as under the contention of the counsel for respondent the words " the appropriate fund " must be made to read "appropriated funds." It is elementary that an act must be so construed, if possible, as to give effect to all its provisions, as it is presumed that the legislature intended each to answer some appropriate and specific purpose; and with the interpretation here indicated all the other provisions of the act prescribing and governing the secretary's official duties as auditor of public accounts and in the capacity of superintendent of the fiscal concerns of

the state become operative at all times, otherwise the most important of them must fall utterly into disuse whenever it happens that appropriations have been exhausted, and all the time suspended as to any particular items or claims where funds are not set aside in the treasury for their discharge. We may instance some of them. By section 2208 the secretary is required to report to the legislature at the commencement of each regular session a complete list of all accounts so audited, and to enter in a book kept for that purpose an abstract of all warrants drawn on the treasury, showing the date, number, name of claimant, the amount claimed, the amount allowed thereon, and from which fund to be paid. And by section 2209 it is prescribed that all persons having claims shall present them to the secretary to be audited, settled, and allowed within two years, and not afterwards; that, if any person is dissatisfied with his decision on any claim, account, or credit, it is made his duty, at the request of such person, to refer the same to the legislative assembly; and that in all suits in behalf of the state no debt or claim shall be allowed against the state as a set-off but such as have been exhibited, and by him allowed or disallowed. Under the theory that there can be no auditing unless there is an appropriation, all these clauses, among others, would rest in abeyance for the time being, and in some instances become absolutely nugatory, public service would be impeded, and individuals might suffer an injustice. There is a natural and rational implication from the provisions here alluded to that the secretary should act upon the claims presented to him with reasonable

dispatch; and, as there are no exceptions touching when he shall not act, we infer that the want of an appropriation of funds then applicable will not suspend his decision. We hold, therefore, that when a claim against the state is presented to the secretary he must act upon it, whether there has been an appropriation of funds with which to meet it or not; and, if allowed, he must indorse upon it the amount so allowed, and the fund,— one of the original funds subsisting under provisions of law, not the subdivided or appropriated fund, from which it is to be paid,— and draw his warrant on the treasury for the same. He has nothing to do with the subdivided fund. The treasurer must look to that: *State* v. *Hoffman*, 35 Ohio St. 435.

The drawing of the warrant is made a part of the act of auditing, and it is the claimant's evidence or certificate of the allowance. Nor is it the drawing of money from the treasury: *Evans* v. *McCarthy*, 42 Kan. 426 (22 Pac. 631).

The warrant is but prima facie, not conclusive, evidence of the validity of the allowed claim; and unless there is authority of law for the payment of such claim, the treasurer may refuse, and, indeed, it is his duty to refuse, to pay the warrant, even if funds are appropriated: *Goldsmith* v. *Baker City*, 31 Or. 249 (49 Pac. 973); *State* v. *Lindsley*, 3 Wash. 125 (27 Pac. 1019). The legislature could have provided for auditing or settling claims and demands against the state without at the same time directing the warrant to be drawn, or it could have directed that no warrant should issue without an appropria-

tion, but it has not seen fit to do so, and it seems to
be the general policy of our legislation to associate
the drawing of the warrant with the auditing of the
claim, so that they become part and parcel of the
same act. There are some exceptions to be found in
the statute, but the particularity with which they are
usually specified, directing, in effect, that no warrant
shall issue unless there are funds set aside in the
treasury with which to meet the demand, but fortifies
the idea of the recognized existence of the general
plan under which the absence of a prior appropria-
tion of funds is not an objection to the issuance of
the warrant: *People* v. *Lippincott*, 72 Ill. 578; *People*
v. *Secretary of State*, 58 Ill. 94.

It sometimes occurs, however, that special appro-
priations are made for a particular purpose where the
act itself authorizes the incurring of the expense, and
is the only warrant of law therefor. In such cases, of
course, the measure of the appropriation is the limit
of authority to obligate the state, and hence the sec-
retary could neither audit nor draw his warrant, be-
cause the claim is not one which the law would recog-
nize as valid against the state: *Flynn* v. *Truner*, 99
Mich. 96 (57 N. W. 1092).

In coming to this conclusion we have not over-
looked the case of *Brown* v. *Fleischner*, 4 Or. 132.
This authority may be regarded as in point, as it was
based mainly, if not exclusively, upon the ground that
the authority of the secretary of state to audit ac-
counts and draw warrants upon the treasurer depends
upon the condition that an appropriation has been
made for their payment, although the proceeding was

for a writ of mandamus against the treasurer to compel him to pay warrants.  But we firmly believe that the case was decided upon a mistaken interpretation of the statute, and we cannot give our approval to a construction which, in effect, suspends the operation of certain plain and distinct provisions necessary to the due and orderly administration of the public service, and which at the same time nullifies completely one of the most important constitutional functions pertaining to the office of secretary of state whenever there is not a subsisting appropriation.  If such was the intention of the legislature, it would no doubt have given some indication thereof in expressing its will pertaining to the subject; and in the absence of such an indication, we feel constrained to believe that such was not its intention.  The case of *Brown* v. *Fleischner* will, therefore, be overruled in so far as it is in conflict with this opinion.

This leaves but one other question to be determined, and that is whether the secretary should be required to audit and draw his warrant for this particular demand.  The authorities seem to be uniform that, when the nature and amount of the services rendered the state are definitely fixed and ascertained, and the compensation therefor is regulated by law, such as the salaries of public officers, the duty of auditing and allowing the account or claim for such services becomes a mere ministerial act, the performance of which may be required by mandamus.  And so it is with drawing the warrant for the payment of the claim or demand: High on Extraordinary Remedies, §§ 101, 104, 105; *Fowler* v. *Peirce*, 2 Cal. 165; *Bryan* v.

31 Or.— 26.

*Cattell*, 15 Iowa, 538; *Swann* v. *Buck*, 40 Miss. 268, 291. In accordance with these considerations, the judgment of the court below will be reversed, and the cause remanded, with directions to that court to overrule the demurrer.

REVERSED.

MR. JUSTICE BEAN.

I concur in the view expressed in the prevailing opinion that under the statute the secretary is not authorized to audit a claim without issuing his warrant to the claimant as evidence thereof. The two acts seem to be made by the statute concurrent. But I am not entirely satisfied with the conclusion that he can be compelled by mandamus to audit a claim and issue a warrant thereon, in the absence of an appropriation by the legislature with which to pay the warrant when issued; but, as my associates are agreed upon the question, I do not feel authorized to dissent upon the doubt I entertain.